15 So.2d 65

**STANDARD OIL CO. OF LOUISIANA v.
FUTRAL et al.**

No. 36835.

May 17, 1943.

Rehearing Denied July 13, 1943.

Chas. F. Byrnes and Engle & Laub, of Natchez, Miss., and Lewis & Lewis, of Opelousas, for appellant.

Modisette & Adams and W. H. Adams, all of Jennings, Samuel I. Rosenberg and Bernard Titche, Jr., both of New Orleans, Wm. Alex Robertson and Charles F. Boagni, both of Opelousas, Liskow & Lewis, of Lake Charles, F. Leonard Hargrove, of Shreveport, Amos K. Gordon, Jr.,

and Wilkinson, Lewis & Wilkinson, all of Shreveport, for appellees.

ODOM, Justice.

This is a concursus proceeding. Sam W. Futral owns in fee 266⅔ arpents (approximately 226 acres) of land, all in one tract, in the Parish of St. Landry. On May 16, 1938, he, joined by others, leased the southern 100 acres of that tract to Smith & McDannald for the production of oil, gas and other minerals. The lessees, Smith & McDannald, or their successors, operating under their lease, began the drilling of a well on said land on or before May 15, 1939, and said well was completed as a producer in the month of August, 1939. They began the drilling of a second well on or about December 28, 1939, and this well was completed as a producer during the month of March, 1940. They began the drilling of a third well on said premises on or about October 17, 1940, and this well, like the first two, was completed as a producer.

In the execution of this lease by Futral, the fee owner of the land, he was joined by some 20 or 25 other individuals, the said Futral and the other individuals styling themselves "'Lessor' (whether one or more)". The lease contract granted to the lessees the exclusive right and privilege of developing the property for minerals, and contains the following clause as to royalty:

"The royalties to be paid by lessee, are: (a) on oil, one-eighth of that produced and saved from said land, the same to be delivered at the well or to the credit of lessor in the pipe line to which the wells may be connected * * *."

The Standard Oil Company of Louisiana purchased from the producers all of the oil which came from these wells on Futral's land. A controversy arose as to who was entitled to the proceeds of the $\frac{1}{8}$ of the oil reserved as royalty (or $\frac{5}{64}$ of all the oil produced). It seems to be conceded by all parties that Sam W. Futral, the fee owner of the land, was entitled to the proceeds of $\frac{3}{64}$ of all the oil produced as his proportionate share of the $\frac{5}{64}$ reserved royalty. It is alleged, and not denied, that Futral notified the Standard Oil Company that certain parties were claiming the proceeds of $\frac{5}{64}$ of the oil produced, and requested the Standard Oil Company to hold in its possession the proceeds of the $\frac{5}{64}$ interest until the controversy between himself and the other claimants as to who was entitled to the proceeds of the $\frac{5}{64}$ should be determined in a proper judicial proceeding.

The Standard Oil Company provoked this concursus proceeding on October 19, 1940, alleging that it had in its possession the sum of $5629.35, which represented the proceeds of $\frac{5}{64}$ of the oil purchased by it and produced from a portion of the Sam W. Futral land, situated in St. Landry Parish, which sum was claimed by two or more persons. It alleged that it had purchased all of the oil produced from said tract, amounting to 69,553.7 barrels; that said oil had a total value, after state severance taxes were deducted, of $72,055.79, and that the $\frac{5}{64}$ royalty interest therein amounted to $5629.35.

The Standard Oil Company alleged that it had no interest in said sum and asked to be permitted to deposit the amount in the registry of the court, to be distributed to the respective claimants as their interests might be determined by the court. It named the various claimants, set out the post office address of each, and asked that they be cited to appear and establish their claims, if any, according to law, and that, upon the deposit of said amount in the registry of the court, it be relieved from all liability on account thereof. It alleged that the proceeding was brought under Section 7, Act No. 123 of 1922.

On October 19, 1940, the district judge signed an order permitting the Standard Oil Company to deposit the amount in the registry of the court, and ordered all claimants to be cited and served. Each of the claimants, including Sam W. Futral and his attorneys, who were also made parties, accepted service, waived citation, and submitted themselves to the jurisdiction of the court.

Subsequently the Standard Oil Company filed two supplemental petitions, one on March 13, 1941, and the other on August 4, 1941, alleging that, since the filing of the concursus proceeding, it had purchased additional quantities of oil from the wells, the value of $\frac{5}{64}$ interest amounting to $9,096.99, which sum it asked to deposit along with the original deposit, the total of all deposits being $14,726.34. After the trial but prior to the rendition of the decree, there was an additional deposit made of $4,431.50; so that the total sum now on deposit amounts to $19,157.84.

Sam W. Futral, the fee owner of the land, came into court by way of answer and

alleged that the entire amount deposited should be paid to him and his attorneys. He admits that, of the proceeds of the ⅛ (or ⁸⁄₆₄) royalty reserved under the lease, the Standard Oil Company had paid him ³⁄₆₄, thus leaving only ⁵⁄₆₄ of the proceeds in controversy.

The claimants other than Futral came into court and alleged that they were entitled to certain interests in the amounts deposited by the Standard Oil Company, under and by virtue of certain contracts which they and their authors in title had with the said Futral, the fee owner of the land.

There are two sets or groups of these claimants. The trial judge designated these claimants as "Class A" and "Class B". The claimants grouped together as "Class A" alleged that they were entitled to be paid, jointly and in the proportions stated by them, ⁴⁄₆₄ of the amount deposited. The other group, the "Class B" claimants, alleged that they were entitled to ⅟₆₄ of the amount.

In this connection, it is proper to state here that, as between the claimants grouped as "Class A", there is no dispute among them as to what proportion of the ⁴⁄₆₄ should be paid to each, and, as to the "Class B" claimants, there is no controversy among them as to what proportion of the ⅟₆₄ should be paid to each. And it is conceded by all parties that the claims of these two groups are not antagonistic. The controversy is between Futral, who claims the entire amount deposited, and all other claimants.

There was judgment against Futral, rejecting his demands and ordering the funds

deposited to be paid to the "Class A" and "Class B" claimants. From this judgment Futral appealed.

Those persons grouped as "Class A" ground their claims on a contract of sale of minerals and royalty interest executed by Sam W. Futral, the fee owner of the land, in favor of Jesse P. Barnett and Raoul LeBourgeois on September 11, 1926, and on a correction deed between the same parties, dated February 8, 1929. The original contract of sale recites that Futral, in consideration of the sum of $200 paid by Barnett and LeBourgeois, the receipt of which is acknowledged,

" * * * has granted, sold and conveyed and by these presents, does grant, sell and convey unto said grantee an undivided (⅟₁₆) One Sixteenth interest in and to all of the oil, gas and other minerals of every kind and character in, on or under that certain tract or parcel of land situated in the Parish of St. Landry, State of Louisiana, and described as follows:

"A certain tract of land situated in Section ⁄# 20 and 7 T-6-S, R-5-E, and T-6-S, R-6-E, containing the 100 acres leased to Harvey J. Wier and assigned to the Humble Oil Co. of Houston, Texas. Bounded on North by Lessor, South by Wilson-Cochran—East by Sibille Co.—West by Thopile Johnson.

"To have and to hold the said undivided interest in all of the said oil, gas and other minerals in, on and under said land, together with all and singular the rights and appurtenances thereto in any wise belonging, with the right of ingress and

egress and possession at all times for the purpose of mining, drilling and operating for said minerals and the maintenance of facilities and means necessary or convenient for producing, treating and transporting such minerals, and for housing and boarding employees, unto said grantee, its successors and assigns, forever. * * *

"This conveyance is made subject to any valid and subsisting oil, gas or other mineral lease or leases on said land, including also any mineral lease, if any, heretofore made or being contemporaneously made from grantor to grantee; but, for the same consideration hereinabove mentioned, grantor has sold, transferred, assigned and conveyed and by these presents does sell, transfer, assign and convey unto grantee, its successors and assigns, the same undivided interest (as the undivided interest hereinabove conveyed in the oil, gas and other minerals in said lands) in all the rights, rentals, royalties and other benefits accruing or to accrue under said lease or leases from the above described land; to have and to hold unto grantee, its successors and assigns."

It will be noted that, by the express terms of this contract, Futral sold to Barnett and LeBourgeois an undivided $\frac{1}{16}$ interest in and to all of the oil, gas, and other minerals in, on, or under the land described, and that the conveyance was made subject to any valid, subsisting oil, gas, or other mineral lease which he might have made covering this land. In the clause describing the land, it is recited that the land is the same as that leased to Harvey J. Wier and assigned by Wier to the Humble Oil Company. The lease made by Futral to Wier covering the same land was executed on September 2, 1926—nine days before the sale was made to Barnett and LeBourgeois. It will be further noted that, according to the terms of this contract, Futral, for the same consideration, $200, sold to Barnett and LeBourgeois "the same undivided interest (as the undivided interest hereinabove conveyed in the oil, gas and other minerals in said land) in all the rights, rentals, royalties and other benefits accruing or to accrue under said lease or leases from the above described land".

The correction deed was executed on February 8, 1929, more than two years after the execution of the original deed. According to the correction deed, Futral, for the same consideration of $200, cash in hand paid, sold to the same parties, Barnett and LeBourgeois, " * * * an undivided One-half ($\frac{1}{2}$) interest in and to all the oil, gas, sulphur and other minerals of every character in, on or under or that may be produced from the following described property."

The full description of the land in the correction deed is the same as that contained in the original deed, with this additional clause inserted following the full description:

"Said tract being measured off the extreme Southern end of Grantor's larger tract of approximately Two Hundred (200) arpents."

The correction deed, like the original, contains the following clause:

"To have and to hold unto the said Jesse P. Barnett and Raoul LeBourgeois

and their heirs and assigns, the said undivided one-half (½) interest in and to all the oil, gas, sulphur and other minerals in, on and under, and that may be produced from, said land, * * * with the right of ingress and egress and possession at all times for the purpose of mining, drilling", etc.

This deed contains the stipulation that it is made subject to the above mentioned oil, gas, and mineral lease made by Futral to Harvey J. Wier on September 2, 1926, and recites: "* * * but for the same consideration above mentioned Grantor Sam W. Futral has sold, transferred, assigned and conveyed, and by these presents does sell, transfer, assign and convey unto the said Jesse P. Barnett and Raoul LeBourgeois, Grantee, and their heirs and assigns, the same undivided interest, being an undivided one-half (½) interest, in and to all of the rights, rentals, royalties and other benefits accruing under said lease or leases from the above described land, to have and to hold the same unto said Grantee, and their heirs and assigns, forever, and a like undivided interest in all rights, rentals, royalties and other benefits attributable to said land from any renewals of said existing lease, or from any subsequent lease of said premises."

The following explanatory clause is inserted:

"It being clearly understood, that where the royalty in oil or gas payable to the owner of the soil from said above described land in its entirety is one-eighth (⅛) of the entire production of oil or gas therefrom, then Grantee shall receive one-half of said one-eighth royalty or one-sixteenth (1/16) of the total oil or gas produced from said premises, and that Grantee is to receive a like proportion, that is an undivided one-half (½), of any other royalties, rents or benefits received on account of sulphur or other minerals produced."

Then follows a clause which provides that the money rentals stipulated to be paid on an acreage basis for the extension of time on the existing oil and mineral lease are excluded from this conveyance and shall be paid in their entirety to the grantor, Sam W. Futral, his heirs or assigns.

Then follows this final provision:

"This instrument is executed and intended as a correction of an instrument executed between same parties of date Sept. 11, 1926, styled 'Mineral Deed & Royalty Transfer', recorded Sept. 13, 1926, * * * in which prior instrument the undivided share of oil, gas and minerals, and undivided share of rights, rentals, royalties and benefits conveyed, was erroneously stated as one-sixteenth (1/16), when in truth and in fact Grantor intended to convey, and Grantees intended to acquire, an undivided one-half of all oil, gas, sulphur and other minerals in, on, under or produced from the above described land, and a like undivided one-half (½) of all rights, rentals, royalties and other benefits accruing or to accrue from said land under the existing lease above referred to, or any renewal thereof or any subsequent lease, which under the existing lease [the lease executed by Futral to Wier on September 2, 1926] would be one-half of the stipulated

royalty of one-eighth (⅛) of the oil or gas produced from said land, or a royalty of one-sixteenth (¼₆) of the entire production of oil or gas from said land. This instrument is to stand in lieu and in place of said prior instrument, and not as an additional conveyance."

This correction deed is attacked by Futral, who alleges that it is utterly null and void because he was induced to sign it through fraud and error. We shall discuss this point later on in this opinion.

The claimants grouped together as "Class B" base their right to participate in the distribution of the fund deposited on a sale made by Sam W. Futral, the landowner, to Peter J. Van Geffen, Jr., on February 1, 1929. By this instrument Futral, the landowner, sold also to Van Geffen mineral interests in lands not involved in this suit. In so far as the issues here involved are concerned, Futral, according to the instrument, did " * * * grant, bargain, sell, convey and deliver with full guarantee of title and with complete transfer and subrogation of all rights and actions of warranty * * * unto Peter J. Van Geffen, Jr., * * * One Sixty-fourth (¹⁄₆₄) of all the oil, gas, sulphur, and other minerals in and under, and that may be produced and saved from the following described land; A certain tract of land situated in Section 20, of T-6-S, R-5-E, and in Section 7, of T-6-S, R-6-E, containing One Hundred (100) acres, and to be taken from the Southern end of a tract of land containing Two Hundred Sixty-six & ⅔ (266⅔) arpents; said One Hundred (100) acres to extend the full

width of the whole tract; the Northern line of said One Hundred (100) acres to run parallel to the Southern boundary of the whole tract. The said One Hundred (100) acres being bounded on the North by tract thirdly herein described, on the South by Wilson & Cochran, and Devillier heirs now or formerly, on the East by Joseph Camille and The Sibille Company, and on the West by J. Jeansonne."

This deed contains the following additional clause:

"It is understood and agreed that the purchaser is to receive as a royalty * * * One-eighth (⅛) of all royalties received by vendor on Lot 2 herein described, namely, the One Hundred (100) acre tract; * * * purchaser to receive said royalty under the now existing or any subsequent leases entered into by vendor; vendor however, specifically reserving the right to enter into any new leasing contracts he may see fit, provided, however, that he shall not enter into any such leasing contract for a consideration of less than One-eighth (⅛) royalty on all oil, gas, sulphur or other minerals."

Then follows a clause which provides that Futral is to receive any and all cash rentals or renewals paid or to be paid under the existing leases on property hereinabove described or under any leases that may be subsequently made.

■ There is no essential difference between the nature and effect of the sale made by Futral to Barnett and LeBourgeois and that of the sale made to Van Geffen. In the correction deed to Barnett and LeBourgeois, Futral granted to his vendees

a specified undivided interest in and to the minerals or mineral rights in and under the land described, and, in addition thereto, a specified undivided interest in and to the royalties reserved by him under the then existing lease or any subsequent lease which he might execute covering the same land. In the Van Geffen deed he did the same thing. The only difference between the two contracts is that in the Barnett and LeBourgeois sale Futral specifically granted the right to explore and search for minerals, while in the Van Geffen sale this right was not mentioned. But the sale of an interest in minerals or mineral rights by a landowner necessarily carries with it the right to explore, for reasons stated later on in this opinion.

Futral by his pleadings raised a number of issues, each of which we shall discuss. However, the main point stressed by him is that whatever rights these claimants in each of the groups "A" and "B" may have acquired under the deeds which we have mentioned, and from which we have quoted at length, have been lost by the prescription of 10 years liberandi causa, under Articles 789, 3544, and 3546 of the Revised Civil Code, which prescription is specifically pleaded by him. If these claimants have lost their rights in that manner, the other issues need not be discussed. We shall therefore first dispose of the plea of prescription.

There is no merit in this plea. The plain and unambiguous language used in the acts of sale by Futral to Barnett and LeBourgeois and to Van Geffen shows clearly that Futral intended to convey, and that his vendees intended to acquire, not only an interest in the minerals or the mineral rights in the land, but also an interest in Futral's reserved royalties under the then existing mineral lease covering the same land and under such mineral leases as he might later make.

The mineral lease which Futral made to Wier, and which Wier transferred to the Humble Oil Company prior to these sales, was then alive, and the sales to Barnett and LeBourgeois and to Van Geffen were made subject to that lease. But that lease was voluntarily relinquished and cancelled by the Humble Oil Company on November 21, 1929.

Futral's vendees, having acquired from him an interest in the minerals or mineral rights in his land, acquired rights in the nature of a personal servitude to go upon his land to explore for minerals. There was no production from the land within 10 years from the dates on which these sales were made; so that the claimants under each of the groups have lost their rights by the prescription of 10 years liberandi causa, under the articles of the Code cited above and the numerous cases cited in the case of Palmer Corporation v. Moore, 171 La. 774, 132 So. 229, unless some event or condition has intervened to interrupt the running of prescription.

As relates to the nature of the rights and privileges acquired by Futral's vendees, the cases cited and discussed below are in point.

In the case of Patton's Heirs v. Moseley, 186 La. 1088, 173 So. 772, 774, we said:

"It is well settled that a sale or reservation of the mineral oil or gas in a tract of

land constitutes a sale or reservation merely of a real right, or personal servitude, to go upon the land and explore for oil or gas and to possess and own such oil or gas as may be produced."

In support of that general proposition the court cited the case of Palmer Corporation v. Moore, 171 La. 774, 132 So. 229, 230, and the authorities there cited. In the Palmer Corporation case, the court used the following language:

"A sale or reservation of the mineral oil or gas in a tract of land constitutes a sale or reservation merely of a real right, or personal servitude, to go upon the land and explore for oil or gas and to possess and own such oil or gas as may be produced; and such a real right or servitude is lost by the prescription of ten years, liberandi causa, if the owner of the right, being not the owner of the land itself, fails to exercise it for a period of ten years."

In the case of Clark v. Tensas Delta Land Co., 172 La. 913, 136 So. 1, 2, where land was sold with the reservation of ½ of the minerals, it was held that the reservation carried with it the right to take ½ of the minerals, which right constituted a servitude on the land. The court said:

"What the Delta Land Company owned was not half of the right to the minerals, but the right to half of the minerals, in Clark's land."

See, also, Bodcaw Lbr. Co. v. Cox, 159 La. 810, 106 So. 313, where it was held that a grantor's reservation of undiscovered oil, gas, and minerals under the land granted was, in effect, a reservation of the right to

mine for, and reduce to possession, such minerals.

And the same rule applies where the owner of the land and other persons are co-owners of the minerals. In the Clark case, supra, the court said:

"The defense pleaded by the company is that prescription could not run against the company because Clark and the company were co-owners of the mineral rights, and therefore the company could not go upon the land to drill for the oil, gas, or other minerals, without Clark's· consent. Hence the defendant invokes the rule, contra non valentem agere nulla currit praescriptio."

Answering this argument we said:

"The right which the Tensas Delta Land Company acquired from the Kimball Lumber Manufacturing Company was a servitude on the latter's land. See list of decisions in Palmer Corporation v. Moore, 171 La. 774, 132 So. 229. Article 655 of the Civil Code declares that one of the characteristics of a servitude is that it does not oblige the owner of the estate that is subject to the servitude to do anything, but obliges him merely to permit to be done on his estate what is necessary for the owner of the servitude to have the benefit of it. Therefore, the Kimball Lumber Manufacturing Company was obliged, and so was each subsequent owner of the land subject to the servitude obliged, to permit the Tensas Delta Land Company to go upon the land and explore for oil, gas, and other minerals, and to reduce them to possession, and account to the owner of the land for half of such oil, gas, or other minerals."

But the running of prescription under the Barnett and LeBourgeois sale was repeatedly interrupted. On December 3, 1929, a few days after the Wier lease was relinquished by the oil company, Futral, the landowner, granted a mineral lease on the same property to C. B. Pennington, and on January 7, 1930, Pennington assigned the lease to C. F. Byrnes.

On February 12, 1930, J. P. Barnett and Raoul LeBourgeois, and certain other persons who had acquired mineral interests from them, executed an oil, gas, and mineral lease covering the same property in favor of C. F. Byrnes, Trustee; so that Byrnes, Trustee, had two leases on this property—one from Futral, and one from Barnett, LeBourgeois, et al. Byrnes, Trustee, assigned these leases to A. C. Glassell, W. C. Woolf, and W. A. Haynes. According to the agreed statement of facts, Glassell, Woolf, and Haynes drilled a well on the land to a depth of 4,500 feet, and this well was abandoned as a dry hole on July 18, 1930. This well was known as the "Alex Rice, Trustee (or Rice Drilling Company)—Sam Futral Well No. 1". It seems to be conceded that this was a bona fide effort to produce oil from the land. No further efforts seem to have been made to discover oil under these leases.

On November 30, 1935, Sam W. Futral, the landowner, joined by all those who had acquired rights under his sale to Barnett and LeBourgeois, executed an oil and mineral lease on the same land in favor of O. H. McClelland. McClelland assigned the lease to the Texas Company on January 23, 1936, and the Texas Company began the drilling of a well on the property on March 28, 1936. The well was drilled to a depth of 5,997 feet. No production resulted from these operations.

There were therefore two bona fide efforts made to discover oil, one in 1930 and another in 1936, and, while no production was obtained in either case, these operations interrupted the running of prescription. Keebler v. Seubert, 167 La. 901, 120 So. 591; Louisiana Petroleum Co. v. Broussard, 172 La. 613, 135 So. 1; Lynn v. Harrington, 193 La. 877, 192 So. 517; Ohio Oil Co. v. Cox, 196 La. 193, 198 So. 902.

On May 16, 1938, Futral, the landowner, joined by all those who had acquired interests under his sale to Barnett and Le-Bourgeois, executed a mineral lease on the same property in favor of Smith & Mc-Dannald. Smith & McDannald, or their successors, drilled three wells on the property, each being a producer, during 1939 and 1940. These wells produced the oil which was purchased by the Standard Oil Company.

Clearly, therefore, claimants under "Class A" have not lost their rights by the prescription of 10 years liberandi causa, the prescription which ran against them having been repeatedly interrupted by bona fide drilling operations.

Another reason why these parties have not lost their rights by prescription is that Raoul LeBourgeois, one of Futral's vendees, died on October 10, 1934, long before the end of the prescriptive period, and left a minor son, Florian, who inherited an

interest in his father's estate. This son, Florian LeBourgeois, died on March 8, 1938, before reaching his majority, and left as his sole heir a minor child, Robert Raoul, who is still a minor (having been born December 13, 1937), and who is a party to this suit. The settled jurisprudence of this state is that the minority of any co-owner of a servitude interrupts the running of prescription in cases of this kind. Sample v. Whitaker, 172 La. 722, 135 So. 38; Ford v. Williams, 189 La. 229, 179 So. 298; Ohio Oil Co. v. Cox, 196 La. 193, 198 So. 902.

Neither Van Geffen nor any of those who acquired rights under him made any effort to develop the land for minerals, as did Barnett and LeBourgeois and those who claim under them. But the running of prescription against Van Geffen and those who claim under him was interrupted by the intervention of the rights of certain minors, who acquired by inheritance certain interests in the servitude before the end of the prescriptive period.

Van Geffen, in whose name the minerals and royalties were acquired from Futral, is still living, but the purchase was made for himself and others, one of whom was Charles R. Houssiere, whose wife was then living. Such rights as Houssiere acquired fell into the community which existed between him and his wife. His wife died on February 15, 1929, two weeks after the purchase by Van Geffen, and left seven minor children who inherited her community interest in the property. Some of these children are still minors. Nathan Rosenberg also acquired an interest in these minerals with Van Geffen. Rosenberg died intestate on June 12, 1932, leaving two minor children, aged 13 and 16.

But counsel for Futral argue that Houssiere and Rosenberg never in fact acquired any interest in the sale to Van Geffen, and that therefore the Rosenberg and Houssiere minors never owned any interest therein. The claimants under the Van Geffen deed, other than Van Geffen himself, base their claims on a so-called counter letter, which reads as follows:

"Jennings, La., Feb. 23, 1929.

"Mr. Charles R. Houssiere,

"Jennings, Louisiana.

"Dear Charlie:

"I am enclosing my check for $583.33 for a 1/16 interest in that certain contract covering sale of minerals Sam W. Futral—P. J. Van Geffen, Jr., dated February 1, 1929. My understanding of this contract is as follows: Cash paid to H. A. Houssiere & Bro.

| Dr. C. H. Wright | 20% | $700.00 |
| N. Rosenberg | 10% | 350.00 |
| H. Latter | 10% | 350.00 |
| W. Oldenberg | 10% | 350.00 |
| C. R. Houssiere | 16⅔% | 583.33 |
| H. A. Houssiere | 16⅔% | 583.33 |
| P. J. Van Geffen, Jr. | 16⅔% | 583.33 |

$3500.00

"Cash paid by H. A. Houssiere & Bro. as per draft drawn by Peter J. Van Geffen, Jr., in favor of Sam W. Futral $3500.00. If your records or understanding differ in any way with the above kindly advise me.

"Yours very truly,

"Peter J. Van Geffen, Jr."

Counsel contend that this is not a counter letter according to Bouvier's definition quoted in the case of Karcher v. Karcher, 138 La. 288, 70 So. 228, 229, "An agreement to reconvey where property has been passed by absolute deed with the intention that it shall serve as security only. A defeasance by separate instrument."

Under the terms of the above quoted letter and according to the testimony of Van Geffen, it is clear that the purpose of the letter was to show that Van Geffen purchased the property, not for himself alone, but for himself and those named in the letter, in the proportions set out therein. Van Geffen in his testimony makes this perfectly clear. He says that, at the time the property was purchased, one of the Houssiere brothers was with him, and that it was understood that the purchase price of $3,500 was to be paid by draft drawn on "H. A. Houssiere & Bro.", which was done. And it was then clearly understood that the interest in the minerals was acquired, not for himself alone, but for himself and the others mentioned.

■ Since Van Geffen is not complaining, but concedes that the others named in the letter own the undivided interests in the minerals as set out therein, Futral has no right to complain, because he does not now deny that by his sale to Van Geffen he divested himself of title to an undivided ⅟₆₄ of his minerals or mineral rights.

In connection with the claims made by those grouped as "Class A", counsel for Futral say that the correction deed from Futral to Barnett and LeBourgeois, dated February 8, 1929, "whereby the royalty interest of ⅟₁₆ transferred to the latter by the original deed of September 11, 1926, was jumped up to ½ royalty interest *without any pretended consideration,* was freighted with error, fraud and deception practiced on Futral".

■ It is hornbook law that he who alleges fraud or error in the execution of contracts carries the burden of proving such allegations. Futral alleged, but failed to prove, that he executed the instrument dated February 8, 1929, through fraud or error.

The testimony shows that, some 10 days prior to the execution of that instrument, Harvey J. Wier approached Futral and stated to him that there was an error in the original deed in so far as the royalty interest was concerned, and asked Futral whether he would correct the error. Futral told Wier that, if there were error in the deed, he would correct it. However, his wife was not at home at the time, and he said that before taking any steps he wanted to consult her. He did consult her, and consulted his son-in-law Graves as well. The correction deed was drawn by W. Alex Robertson, an attorney and notary public. Futral, together with his wife and his son-in-law Graves, went to Mr. Robertson's office, where the deed was exhibited to the three. Mr. Robertson testified that he read and explained the deed to them. Mr. Futral testified that he did not remember whether the deed was read to him or not. Mr. Graves and Mrs. Futral said that it was. The testimony shows that the only objection raised by Mr. Futral to the instrument drawn by Mr. Robertson, the

notary, was that it did not provide that delay rentals be paid to him exclusively, whereupon Mr. Robertson corrected the instrument by inserting a clause "that the money rentals stipulated to be paid on an acreage basis for extensions of time on the existing oil and mineral lease are excluded from this conveyance, and shall be payable in their entirety to Grantor Sam W. Futral or his heirs or assigns".

There is no testimony at all which shows or even indicates that Mr. Futral raised the slightest objection to the provisions of the instrument other than that just mentioned. Mr. Futral says he misunderstood the purport of the instrument which he signed. While he is not an educated man, it was shown that he is intelligent and is a good business man. There was no reason why he should not have understood what he was signing. The document itself is couched in clear and unambiguous language. Its terms are too clear and explicit to be misunderstood by any intelligent person. It clearly states that the instrument is executed and intended as a correction of an instrument executed between the same parties of date September 11, 1926, "* * * in which prior instrument the undivided share of oil, gas and minerals, and undivided share of rights, rentals, royalties and benefits conveyed, *was erroneously stated as one-sixteenth (¹⁄₁₆,), when in truth and in fact Grantor intended to convey, and Grantees intended to acquire, an undivided one-half of all oil, gas, sulphur and other minerals in, on, under or produced from the above described land, and a like undivided one-half (½) of all rights, rentals, royalties and benefits accruing or to accrue from said land under the existing lease above referred to, or any renewal thereof or any subsequent lease, which under the existing lease would be one-half of the stipulated royalty of one-eighth (⅛) of the oil or gas produced from said land, or a royalty of one-sixteenth (¹⁄₁₆) of the entire production of oil or gas from said land."* (Italics ours.)

It is inconceivable that the writer of a document of this kind, or one procuring its writing, would insert in the document a clause phrased as this one is if he intended to conceal the purpose of the instrument, or intended to defraud the other party. This language is too plain, simple, and unambiguous to be misunderstood.

The amount of the reserved royalties which was transferred to the vendees is explained in two ways: by saying (1) "which under the existing lease would be one-half of the stipulated royalty of one-eighth", and (2) "or a royalty of one-sixteenth (¹⁄₁₆) of the entire production of oil or gas from said land".

Mr. Futral heard this document read, and Mr. Robertson, the notary, says it was explained to him. Mr. Futral's wife and his son-in-law heard it read, and the testimony of Mr. Futral shows that his son-in-law Graves must be a man of intelligence and some experience, since he is a travelling salesman.

Now the question is: If Futral was defrauded, who practiced the fraud?

In their supplemental brief filed some three weeks after the case was argued,

counsel for Futral say at page 4 thereof:

"In oral argument before this Honorable Court, distinct disclaimer was made of any intent to charge any personal fraud on the attorney [Mr. Robertson] who drew the alleged correction deed."

On page 5 of the same brief counsel make it perfectly clear that they "are not charging him [Robertson] with any knowing and willing participation in a fraud"; so that Robertson's skirts are clear.

While Futral alleged, and his counsel contend, that there was fraud and deception practiced in getting him to sign the correction deed, it is not specified who practiced the fraud. From their oral arguments and their briefs, it seems clear that counsel for Futral are of the opinion that Wier instigated the alleged scheme to defraud Futral, because it was Wier who approached Futral and suggested to him that the original sale was erroneous in that it did not correctly specify the quantum of minerals intended to be sold. There is nothing to show, however, that Wier had anything to do with the preparation of the correction deed. He was not present when the deed was prepared or when it was read by Robertson to Futral, his wife, and his son-in-law. Just who told Robertson what the agreement between the parties was is not made clear. Robertson says he did not represent any of the parties as counsel, and that his recollection is that Mr. LeBourgeois paid him for his notarial work in preparing the instrument.

Furthermore, we are not impressed with the testimony of Mr. Futral when he says now that he thinks fraud was practiced up-

on him. He admits that in 1930 he learned that the second document, the correction deed, carried more than $\frac{1}{16}$ of the $\frac{1}{8}$ royalty reserved to him, and that his information came to him from an attorney. We quote the following from his testimony, which is found in Volume III, page 72, of the record:

"Q. When did you first find out the second document carried more than $\frac{1}{16}$? A. When they made the first well on my property, the Rice Brothers, about six years ago.

"Q. Was that the first time you learned about that? A. Yes, sir. I didn't discover it myself. An attorney discovered it and showed it to me."

The agreed statement of facts shows that the Rice well was drilled in 1930. He was asked (Volume III, page 91) whether he had ever gone to Mr. Robertson's office since he gained this information, to complain that he was "fooled into signing the act or that any fraud was enacted against" him on that occasion. His answer was, "No, sir." There is no testimony which shows or even indicates that Mr. Futral ever mentioned the question of fraud, or intimated to anyone that he had been defrauded, during the long period which elapsed between 1930 and the date on which oil was discovered in 1939. His own testimony shows that he learned from an attorney in 1930 as much about the discrepancy between the original and the corrected instrument as he knows today. He knew of the repeated efforts which were being made to extract oil from his land, and yet he took no steps to have the sec-

ond instrument set aside and said not a word about it until after oil was discovered in 1939. Surely, if he had thought all along that fraud had been practiced upon him, he would in the meantime have taken steps to protect his interest. His silence during those years strongly indicates, to say the least, that he knew that no fraud had been practiced upon him.

In Rodgers v. S. H. Bolinger Co., 149 La. 545, 89 So. 688, 690, this court held that:

"When parties reduce their contracts to writing, and when the terms of the writing exhibit no uncertainty or ambiguity as to the nature, the object, and the extent of the agreement, it is presumed that the writing expresses the true and complete undertaking of the parties." and that:

"Equity may reform * * * even contracts unambiguous on their face on clear proof that, through fraud or error, the written instrument has been made to express a different purpose from that which the parties had agreed on and had intended to embody therein; but to support relief there must be clear proof of the antecedent contract and of the error in committing it to writing."

In the case at bar, there is no "clear proof"—in fact, no proof at all—that Futral was defrauded. We concur in the view expressed by the district judge that Futral utterly failed to prove fraud and error.

One of the major points stressed by Futral is that the claimants under "Class A", or those claiming under the Barnett

and LeBourgeois sale, have no interest in the funds deposited because the oil was not extracted from property included in the act of sale. As to the claimants under "Class B", or those who claim under the Van Geffen purchase, counsel for Futral argue that the description in the Van Geffen deed is so vague and indefinite that it describes no particular piece of land.

The record shows that on February 14, 1911, Futral purchased a tract of 200 arpents from Ginard Duplechain, and that on February 27, 1911, he purchased another tract of 66⅔ arpents from Marie Louise Lahaye, wife of Louis Saucier. The maps and the descriptions show that the smaller tract lies west of, and adjacent to, the larger tract. The maps show also that the northern boundary of each tract is Bayou Courtableau. They show further that the larger tract extends 399 feet further south than does the smaller tract, and that the southern boundary line of the smaller tract runs parallel to the southern boundary line of the larger tract. The two tracts, taken together, form one large tract containing 266⅔ arpents.

The wells which produced the oil, the proceeds of which are in controversy, are located on the 66⅔-arpent tract. Futral's contention is that no part of the 66⅔-arpent tract is included in the description in the sale by him to Barnett and LeBourgeois. The description contained in the original deed by Futral to these vendees is copied hereinabove. It shows that the land included was the 100 acres which was leased to Harvey J. Wier and assigned by lessee to the Humble Oil Company, and is

"Bounded on North by Lessor, South by Wilson-Cochran—East by Sibille Co.— West by Thopile Johnson".

By referring to the lease made by Futral to Wier on September 2, 1926, we find that the land leased is described as follows:

"That certain tract of land consisting of 100 acres of land more or less and being situated in the Parish of St. Landry and lying in Section 20, Township 6 South, Range 5 East and in Section 7, Township 6 South, Range 6 East, said tract to be taken off the extreme south side of a large tract of land belonging to the above Sam Futral in the above Sections. Said 100 acres being bounded as follows: On the North by lands of Lessor, South by lands of Wilson & Cochran and heirs of Mrs. N. Devillier, East by lands of Sibille Co., Inc., and West by lands of Jeacin Jeansonne."

All the maps found in evidence show that the 66⅔-arpent tract is bounded on the west by the lands of J. A. Perkins and J. C. Cormier. But all parties concede that the Perkins and Cormier lands are the same lands referred to in the lease made by Futral to Wier, and referred to in the sale by Futral to Barnett and LeBourgeois, as the Johnson (or Jeansonne) tract. It is therefore perfectly clear that the land covered by the description in the sale by Futral to Barnett and LeBourgeois extended from the Sibille lands on the east, entirely across Futral's tract of 266⅔ arpents, west to the Johnson lands, and therefore necessarily included the southern portion of the 66⅔-arpent tract.

Futral's contention is that the 100-acre tract described in the sale to Barnett and LeBourgeois was intended to be taken off the south end of the larger, or 200-arpent, tract purchased from Duplechain, which tract lies east of, and adjacent to, the 66⅔-arpent tract purchased from Saucier. He bases his contention on the fact that in the correction deed, about which there is so much controversy, the concluding clause in the description reads as follows:

"Said tract being measured off the extreme Southern end of Grantor's larger tract of approximately Two Hundred (200) arpents."

This clause follows a full and complete description of the land, which is identical with the description in the lease from Futral to Wier and in the original contract of sale made by Futral to Barnett and LeBourgeois. The full description in the correction deed recites that the land is bounded as follows:

"On the North by other lands belonging to Grantor Sam W. Futral, on the South by property of Wilson & Cochran, on the East by property belonging to The Sibille Company, and on the West by property of Theophile Johnson or assigns."

It is clear, therefore, that the concluding clause of the description, which clause appears only in the correction deed, contradicts the full description, because, if the 100 acres is to be measured "off the extreme Southern end of Grantor's larger tract of approximately Two Hundred (200) arpents", it could not be bounded on the west by lands of Johnson; it would have been bounded on the west as well as

on the north by "other lands belonging to Grantor". Furthermore, the correction deed states that the 100 acres of land is the same property on which Futral executed an oil and mineral lease in favor of Harvey J. Wier on September 2, 1926. And, as we have said, the description in the Wier lease recites that the 100 acres is to be measured off the south end of a large tract belonging to Futral and is bounded on the west by "Jeansonne". In the original and in the correction deed by Futral to Barnett and LeBourgeois, it is stated that the 100-acre tract is bounded on the west by lands of Johnson.

In connection with this point we note some inconsistency in Futral's argument. The only possible reason for saying that it was intended that the 100 acres of land involved should be taken off the south end of Futral's larger tract of approximately 200 arpents is that the correction deed contains a clause to that effect, which clause follows the main, full description. And yet one of the main points urged by Futral's counsel is that the correction deed is absolutely null and void as having been obtained through fraud and error.

However, since we have held that the correction deed was not procured through fraud and is therefore valid, it is necessary to discuss this point further.

▰▰ The description in this sale is clearly one per aversionem, under Article 2495 of the Revised Civil Code, which reads as follows:

"Art. 2495. Sale Per Aversionem. There can be neither increase nor diminution of price on account of disagreement in measure, when the object is designated by the adjoining tenements, and sold from boundary to boundary."

There is another article of the Code which contains similar provisions. It is Article 854, which reads as follows:

"Art. 854. Sales by Metes and Bounds (Per Aversionem). If any one sells or alienates a piece of land, from one fixed boundary to another fixed boundary, the purchaser takes all the land between such bounds, although it give him a greater quantity of land than is called for in his title, and though the surplus exceed the twentieth part of the quantity mentioned in his title."

According to the precise terms of the description in the sale by Futral to Barnett and Le Bourgeois, the 100-acre tract of land had three fixed boundaries—on the east the lands of the Sibille Company, on the south the lands of Wilson and Cochran, and on the west the lands of Johnson. But counsel for Futral argue that this was not a sale per aversionem because the northern boundary line of the 100-acre tract was not definitely fixed. According to the description, the tract was bounded on the north by other lands belonging to Futral. Since the 100-acre tract was taken off the south end of Futral's large tract containing 266⅔ arpents, it was necessarily bounded on the north by other lands of the grantor, and the northern boundary line would necessarily be a line running parallel to the southern boundary line of the tract and located a sufficient distance north of the southern boundary line to include 100 acres.

Clearly, therefore, this is a description per aversionem. The clause in the correction deed reading "Said tract being measured off the extreme Southern end of Grantor's larger tract of approximately Two Hundred (200) arpents", which follows the general description, was inserted by Robertson, the notary who prepared the act. There is no testimony which indicates that Futral suggested that this clause be inserted. Robertson testified that, when he prepared the instrument, he had before him maps and records showing that Futral owned one large tract of 266⅔ arpents, his home place, and that there was nothing to indicate that this large tract was made up of two parcels of land. He was asked why he used the word "larger" in qualifying the word "tract" in writing this clause, and he said:

"My recollection is the word 'larger' was used in that case to distinguish Mr. Futral's home place which I have since learned consists of the Duplechain and Saucier tracts, in order to distinguish it from his farm further up the bayou which he had acquired from another source about a year later."

He explained that the use of the figure "200" for "266⅔" was probably just an error, though he had no clear recollection of this.

This clause in the description is not controlling.

As relates to Futral's argument that those who claim under the Barnett and LeBourgeois sale were not entitled to an interest in all of the oil produced under the lease by Futral to Smith & McDannald, it is suggested that there was always uncertainty as to the northern boundary line of the 100-acre tract. This, he says, is indicated by the fact that, after oil was discovered, there was an agreement to fix boundary entered into between Futral and the successors of Smith & McDannald, in which agreement it was stated that "Some uncertainty and doubt exists as to the location of the lands described in and affected by said lease contract". In the lease to Smith & McDannald it was stated that:

"The northern boundary of said 100 acre tract of land is formed by a line drawn parallel with the southern boundary line of the 225 acre tract of which it forms a part, and at such a distance from said southern boundary line as to embrace 100 acres of land."

As we understand the argument, it was thought that this clause in the description contained in the Smith & McDannald lease might be construed to mean that the northern boundary line of the 100-acre tract was a straight, continuous line from the east boundary line of the 200-arpent tract to the west boundary line of the 66⅔-arpent tract, which would leave out of the 100 acres covered by the lease a small portion of the 66⅔-arpent tract on which a well was located. The purpose of the agreement to fix boundary was to clarify the description so as to show that the portion of the land taken out of the 66⅔-arpent tract to make up the full 100 acres extended further north by 399 feet than the portion of the land taken out of the 200-arpent tract. The southern boundary lines of the two tracts are parallel, but the southern boundary of

the 66⅔-arpent tract is 399 feet north of the southern boundary line of the 200-arpent tract. The northern boundary line, as fixed by this agreement, merely clarified the description so as to show that there was a break or jog in the northern boundary line of the 100-acre tract to correspond with the break in the southern boundary line. According to the description set out in this agreement, the northern boundary line of the 100-acre tract corresponds exactly in courses and distances with the southern boundary lines of the two tracts, so that this agreement merely clarified, but did not change, the description.

We find no merit in Futral's contention that the description in the deed to Van Geffen is so vague and indefinite that it really describes no particular land. That deed recites that Futral sold to Van Geffen a ⅟₆₄ of all the oil, gas, etc., in a certain tract of land "containing One Hundred (100) acres, and to be taken from the Southern end of a tract of land containing Two Hundred Sixty-six & 2/3 (266⅔) arpents; said One Hundred (100) acres to extend the full width of the whole tract, the Northern line of said One Hundred (100) acres to run parallel to the Southern boundary of the whole tract. The said One Hundred (100) acres being bounded on the North by tract thirdly herein described [the tract thirdly herein described being a tract of 126 acres, more or less, off the north end of the entire tract], on the South by Wilson & Cochran, and Devillier heirs now or formerly, on the East by Joseph Camille and The Sibille Co., and on the West by Jeansonne."

This description, like that in the sale made to Barnett and LeBourgeois, is one per aversionem, or a sale by metes and bounds. The argument that this description is vague and indefinite has no foundation.

One of the errors complained of by Futral is that the trial court refused "* * * to liberate from the claims of claimants under 'Class A' and 'Class B' that segregated and separated non-contiguous tract of land upon which there had been no exploration or production and located south of the railroad right of way and the State owned paved highway". According to the maps filed in evidence, the track of the Missouri-Pacific Railroad runs east and west and crosses Futral's land near the southern boundary, so that a small portion of his land lies south of the track. The maps show also that a paved highway runs across the tract parallel to the railroad right-of-way, the right-of-way of which is adjacent to the railroad's right-of-way.

Since this is a concursus proceeding involving only the rights of claimants to the proceeds of certain oil extracted from the land, and since there was no oil extracted from that portion of the land which Futral alleged was "segregated and separated" from the main tract by the railway and the highway, the question whether the description in the sale by Futral to his vendees properly included the land so "segregated" was not an issue involved in the case. There is therefore no merit in Futral's contention on this point.

The only other question involved is whether the trial judge erred in ordering

the costs of the proceeding "to be paid out of the fund on deposit in the registry of the Court".

Counsel for claimants "Class A" and "Class B" argue that, since the judgment was against Futral, he should pay all costs, under the general rule that the loser must pay the costs. Articles 549, 550, 551, Code of Practice. But those articles do not necessarily apply to cases of this kind.

This is a concursus proceeding, brought under Act No. 123 of 1922, which makes no provision for the payment of costs. We therefore exercise the power vested in us by Section 2, Act No. 229 of 1910, which provides "That all appellate courts of this State shall have the power to tax the costs of the lower or appellate court, or any part thereof, against any party to the suit, as in its judgment may be deemed equitable".

We think the payment of all costs out of the amount on deposit would be equitable, and it is so ordered.

For the reasons assigned, the judgment appealed from is affirmed.

FOURNET, J., concurs in the decree.

On Application for Rehearing.

PER CURIAM.

In their application for a rehearing, counsel for Sam W. Futral contend that the clause in the Van Geffen deed declaring "that it is understood and agreed that the purchaser is to receive as a royalty * * * one-eight (⅛) of all royalties re-

ceived by vendor * * *" places the interest transferred "in the legal category of a 'royalty deed'" and is not a transfer of a mineral right or servitude as held by us. If that clause were considered alone, there might be merit to their contention, but when it is considered together with all other clauses in the deed and effect is given to each, the construction which we gave the deed, in our opinion, reflects the intention of the parties, i.e. that Futral intended to sell and Van Geffen to acquire a mineral interest or servitude on Futral's land which was not prescribed for the same reasons assigned in our opinion that Futral's deed to LeBourgeois and Barnett had not prescribed.

We have carefully considered each of the other points raised by counsel in their application for a rehearing and, in our opinion, they are equally without merit. Counsel's motion for a rehearing therefore is denied.