**GULF SHORES LEASING CORPORATION, Plaintiff-Appellant,**

v.

**AVIS RENT–A–CAR SYSTEM, INC., Defendant-Appellee.**

**AVIS RENT–A–CAR SYSTEM, INC., Plaintiff-Appellee,**

v.

**GULF SHORES LEASING CORPORATION, Defendant-Appellant.**

**Nos. 30667, 30668.**

United States Court of Appeals, Fifth Circuit.

April 29, 1971.

Rehearings Denied June 8, 1971.

W. P. Wray, Jr., Wray, Simmons & Robinson, Baton Rouge, La., for appellant.

Gilbert L. Dozier, James B. Thompson, III, Dozier & Thompson, Baton Rouge, La., for appellee.

Before WISDOM and GOLDBERG, Circuit Judges, and DAVIS *, Judge.

DAVIS, Judge:

In these diversity actions we are asked to determine whether Avis Rent-A-Car System acted within its contractual rights in summarily terminating, without cause, the license of its franchisee, Gulf Shores Leasing Corporation. On November 1, 1961 Avis had entered into an "Exclusive License Agreement" with another firm, Southwestern Automotive Leasing Corporation ("SALCO"), which gave the latter the right to operate a car and truck rental franchise of the Avis system in Lake Charles, Louisiana. Later that month, Avis and SALCO executed identical agreements granting similar franchises for Lafayette and Baton

Rouge, Louisiana. SALCO did not enjoy great success with these three franchises; and in the summer of 1964, with the encouragement of Avis' field representative and the approval of its home office, the licenses were transferred to a newly-formed company, Gulf Shores Leasing Corporation, the stock of which was owned equally by SALCO and Mr. Roy Bowers, who had previously been an Avis system licensee in Wichita Falls, Texas. Bowers was expected to carry on the rental activities for Gulf Shores at the three Louisiana locations.

The transfers were effected by a separate three-party agreement for each city, entitled "Agreement of Assignment and Assumption to a Corporation", between SALCO ("assignor"), Gulf Shores ("licensee"), and Avis ("licensor"). Bowers paid SALCO $30,000 for the assignment, one-half in cash and the remainder in the shape of the fifty per cent interest in the stock of Gulf Shores. No payment was made to Avis for its approval of the assignment (or for the licenses themselves). The assignment agreements, after being signed, were returned to Avis' home base in New York, and Gulf Shores under Bowers' management began to operate the franchises.

Four months later, Avis notified the other parties that the forms had been misplaced by the New York office and that new assignment agreements would have to be executed. This was done through Avis' field representative who hand-delivered the second set of forms for signature. At about that time, Mr. Bowers also received by mail three additional contracts, each on a form called "Exclusive License Agreement," which purported to grant Gulf Shores an exclusive right to operate as the Avis licensee in the same cities (Lafayette, Lake Charles, and Baton Rouge) in which it was already operating under the authority of the original SALCO assignments. Bowers deposed that he examined these forms but did not read them in detail, nor did he inquire of anyone

* Honorable Oscar H. Davis, U. S. Court of Claims, sitting by designation.

within the Avis organization why the license contracts had been forwarded for his signature. He simply signed and returned them to New York.[1]

During this period Avis employed standard license forms known as the 1955-type agreements, and both the license contracts signed by Bowers on behalf of Gulf Shores in 1964 and those signed for SALCO in 1961 contained identical terms, among which was the following cancellation clause:

14. TERMINATION

Either party hereto shall have the right to terminate this Agreement at any time after one year from the date hereof with or without cause, except that after January 1, 1958, or five years from the date Licensee first became an Avis System Licensee, whichever is later, Licensor may terminate under this Section 14 only with cause; * * * Either party exercising its right to terminate under this Section 14 shall give to the other party hereto, at least 90 days prior to the January 1, or April 1, or July 1, or October 1 preceding or coinciding with such termination date, written notice of its election to do so * * *.

On September 30, 1968 Avis advised Gulf Shores that, effective January 1, 1969, its three licenses were to be terminated without cause, pursuant to this section 14 of the 1964 agreements. Gulf Shores refused to recognize the termination, claiming it was too late, and both parties brought actions in the District Court. With the concurrence of the litigants, the court stayed proceedings in the Gulf Shores suit, and tried the Avis action which sought (1) a declaratory judgment setting forth rights and obligations under the contracts, (2) injunctive relief restraining Gulf Shores from operating car and truck rental franchises or outlets as, or under the guise of, an Avis licensee, or harassing or obstructing Avis in its own operation, or (should Avis so choose) its relicensing of the franchises or outlets in the three cities, (3) the return of all physical indicia in the possession of Gulf Shores which suggested or denoted any form of association or connection with Avis, and (4) damages in the amount of $100,000. After trial, the court held that Avis had acted lawfully in terminating the licenses, and granted all the relief prayed for except damages, 316 F.Supp. 1253. Gulf Shores appeals from this judgment.[2]

The main question is whether Avis terminated the Gulf Shores licenses within five years after the latter company first became an Avis system licensee within the meaning of the termination provision. The license agreement signed by Gulf Shores was antedated to August 1, 1964, which, in Avis' view, is the commencement of the five-year period, and therefore the January 1969 termination was timely. Gulf Shores, on the other hand, would have us look to the assignment documents which it contends gave it status as an Avis licensee not on August 1, 1964 (their effective date) but as of the times in November 1961 when SALCO first became an Avis licensee; under this theory, Avis' right to terminate without cause expired in November 1966. Both sides seem to agree that,

1. The case was submitted on a written record consisting of stipulations of testimony, depositions, and exhibits; no oral testimony was given. The parties dispute whether the "clearly erroneous" standard of Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.Code (1964), or *de novo* consideration, governs our review of the findings made on such a written record. *Compare* United States v. El-O-Pathic Pharmacy, 192 F.2d 62, 66 (C.A. 9, 1951) with Leach v. Crucible Center Co., 388 F.2d 176, 178–179 (C.A. 1, 1968). The rule in this Circuit has been indicated to be that the "clearly erroneous" principle applies to findings on a written record although the standard is somewhat modified. Caradelis v. Rifineria Panama, S.A., 384 F.2d 589, 593–594 (1967). Since this appeal turns on issues of law or on legal inferences to be drawn from agreed facts, and in any event we concur in the factual findings below, it is unnecessary to decide the precise measure of review.

2. Avis has not appealed from the denial of damages.

if it makes a difference, Louisiana law governs the interpretation of these writings.[3]

■■ We hold that on balance Avis' reading of the termination clause is correct. In reaching this result, we consider the assignments as well as the license agreements, since neither the integration clause[4] nor the parole evidence rule restricts the court to the licenses themselves in determining contractual rights. Examining all the circumstances (J. R. Watkins Company v. Stanford, 52 So.2d 325, 330 (La.App. 1st Cir. 1951)), we do not think the parties intended the boilerplate integration clause to nullify the prior three-party agreements under which Gulf Shores had actually assumed operation of the businesses dealt with in the licenses. See Hirsh v. Miller, 167 So.2d 539 (La.App. 4th Cir. 1964). In addition, there is, in our thinking, no conflict between the operative terms of the two sets of instruments; even assuming that the assignments are parole evidence with respect to the license agreements, they are admissible. Cf. Gulf States Finance Corp. v. Airline Auto Sales, Inc., 248 La. 591, 181 So.2d 36, 38 (1965); Snow-White Roofs, Inc. v. Boucher, 182 So.2d 846 (La.App. 4th Cir. 1966).

■ First, for the assignments. These papers ("Agreements of Assignment and Assumption") conveyed all of SALCO's "right, title, and interest" in its licenses to Gulf Shores, and the latter's claim is that one of the "rights" it received was its predecessor's nearly three years of operation, as a credit toward the five-year period during which the license could be terminated without cause. However, we think that the as-

signment, as a whole, cannot be squared with this interpretation. Obviously, the appellant had no status whatsoever in the Avis system until the assignment, and one would have to look to the terms of that instrument for the commencement point of its rights. Significantly, there is a specific clause (paragraph 6) providing that "[t]he parties hereto agree that the effective date of said agreement between Licensor [Avis] and Licensee [Gulf Shores] as assignee shall *for all purposes* be August 1, 1964." (emphasis added) Gulf Shores attempts to overcome the apparent import of this sentence, which is reinforced by the italicized phrase, by stressing the words "as assignee." Its construction is that its status as assignee became effective August 1, 1964, but that its status as licensee which is controlling under the termination clause of the license, relates back to November 1961 when SALCO got its franchises. In the face of the all-inclusive phrase, "for all purposes", this is far too much weight to put upon the inclusion of the simple description, "as assignee", in paragraph 6. The dominant tenor of the provision is that August 1, 1964 is the crucial time for all purposes and any exception from that rule would have to have a solid and firm footing, not the mere speculative inference which can conceivably (but not readily) be drawn from the neutral characterization, "as assignee", which appears on its face to do no more than describe how Gulf Shores first entered the Avis system. Moreover, appellant signed the assignment forms in the space calling expressly for the "Name of New Licensee." Since Gulf Shores is thus unqualifiedly denominated the *new* licensee in the assignment itself, it is very hard

---

3. Although the license agreements provide that they "shall be construed in accordance with the law of New York."

4. The integration clause of the 1964 license agreements provided (in part):
"11. WRITTEN CONTRACT ENTIRE AGREEMENT BETWEEN PARTIES
This agreement supersedes all prior agreements whether written or oral be-

tween the parties hereto and contains the entire agreement of the parties, and no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein shall be of any force or effect * * *."

to consider it as nevertheless standing in every respect in the shoes of the former licensee, especially in view of the specific terms of paragraph 6; it would be even more difficult to read the bare words, "as assignee", as somehow implicitly recognizing appellant's status as the "old" licensee at a time well before the effective date of the instrument under which Gulf Shores joined the Avis organization.

■■ Appellant fares no better under the language of the exclusive license agreements which were also made effective as of August 1, 1964, and gave Avis the right to terminate within five years after Gulf Shores first became an Avis system licensee. Those documents described Gulf Shores as "desirous of obtaining a license to use the System", and provided an immediate grant of such license. Nothing in the agreements suggests that appellant had been, or was to be dealt with as, a licensee at any prior time. No reference is made in these forms to the previous SALCO license or to the assignment; on the contrary, Gulf Shores is considered exactly as if it held the first franchises for the three Louisiana cities.

This treatment of the new licensee does not seem unreasonable on its face. The five-year span is a probationary period in which Avis can evaluate the licensee's performance and determine whether it should become a permanent member of the system. Avis could well believe that, for the clause to serve that function, it must apply separately to each new licensee without any "tacking" of a prior licensee's period of operation. In this instance, for example, since SAL-CO's performance was obviously deemed unsatisfactory, it would not be commercially unreasonable for Avis to want to deny Gulf Shores credit for that prior operation.[5] And apart from the facts of this or any particular case, Avis could adopt a universal policy, reflected in its form license agreements, that (at least until the franchise had been in effect for five years) assignees should not hold a preferred status over wholly new operators.

■ There is, furthermore, nothing external to the assignment and license documents of sufficient gravity to counteract the conclusion called for by the written terms. As did the District Court, we reject Gulf Shores' claim that Avis defrauded it into signing the license agreements with their termination provision, and that it is entitled to reformation of these documents to reflect its understanding of their content. There is no serious evidence in the record to support this allegation. The cover letter sent with the license agreements contained the instructions: "We are transmitting the license agreements for Baton Rouge, Lake Charles, and Lafayette to you for your signature. Please review these agreements and return them to me after they are signed. We will return the countersigned copies to you as appropriate." This letter fairly apprised Mr. Bowers of what the enclosed documents were; his failure to read them cannot be attributed to a fraudulent scheme on the part of Avis.[6] Mr. Bowers has said that no one from Avis misrepresented the contents of the agreements or told him that the termination provision's five-year period

5. "Business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs." The Kronprinzessin Cecilie, 244 U.S. 12, 24, 37 S.Ct. 490, 492, 61 L.Ed. 960, 966 (1917); see also Phillips Petroleum Co. v. Gable, 128 F.2d 943, 944–945 (C.A. 10, 1942).

6. He was an experienced businessman entering into an important commercial transaction, and there is no reason to assume that he was incapable of understanding, or asking about, the termination clause. Standard Oil Co. of Louisiana v. Futral, 204 La. 215, 15 So.2d 65, 74 (1943). The case of Crowther v. Avis Rent-A-Car System, 284 F.Supp. 668 (W.D.Wash.1968), cited by appellant, did not declare the termination provision ambiguous. It dealt with the computation of the ninety-day notice period, and held that the notice in that case had not been sent at least 90 days before the quarterly date preceding the termination date, as required by the clause. No issue as to the timeliness of the notice is raised here.

did not apply to Gulf Shores from August 1, 1964 [7] or in any way induced him to sign the license agreements. Nor did Mr. Bowers ever communicate his understanding of the termination clause to Avis, either in the negotiation of the assignments or upon his receipt of the licenses. Fraud has simply not been shown.[8]

A somewhat troublesome point is that in 1955, when these form license agreements were first proposed, the then Avis president, in a general statement to the licensees, referred to the franchises as having "great value" and as allowing the licensees "to acquire an equity in their franchise", and also that the assignment provisions of the form [9] was an important clause permitting sale of the business and transfer of the license. It is not easy to reconcile this declaration, suggesting an equity which can be sold, with the clause allowing cancellation without cause within the full five years after the transfer. At the same time, it is not at all clear that the president intended to adopt the "tacking" theory appellant invokes. But for this case the controlling facts are that there is no showing that Mr. Bowers (or anyone else connected with Gulf Shores) knew about or relied upon this statement, and the Avis testimony is that it has always rejected "tacking". Whatever the former president meant to convey in 1955,[10] in this instance the written terms of the license agreement and of the assignment must prevail.

As an alternative argument on the timeliness of the termination, appellant claims that the true licensee in Lake Charles, Lafayette, and Baton Rouge, from the date of the assignment, was not Gulf Shores but Roy Bowers personally; that he first became an Avis system licensee in August 1963 in Wichita Falls, Texas; and therefore that the termination came too late. The trial judge rejected this contention, and we agree. Avis did desire the personal services of Mr. Bowers as general manager for the licenses, and Avis did often refer to him, informally, in its correspondence as the licensee. The fact remains, however, that the "Assignment and Assumption" agreement was explicitly to a "Corporation," and that in both the assignment and the license agreements Gulf Shores was designated as the new licensee. Mr. Bowers signed those instruments in a representative capacity on behalf of Gulf Shores.[11] While he was a stockholder of Gulf Shores, he was not its sole or even majority owner; SALCO held fifty per cent of the stock. No adequate basis exists for scuttling the express agreement of the parties that Gulf Shores was the licensee.

For the first time on appeal, Gulf Shores also makes various other, more general, arguments: that Avis violated a duty of disclosure founded on the Securities Act of 1933 or the Louisiana Blue Sky Law; that Avis infringed the Federal Trade Commission Act; and that the termination-without-cause provision is

---

7. Bowers did claim that in 1966, at an Avis Licensee Convention in Las Vegas, Mr. W. Leonard Shoultz, Avis' Assistant Vice President, Licensee Relations, told him that Gulf Shores had inherited SALCO's three years of operation toward its five-year period. Mr. Shoultz denied making such a statement. In any event, there obviously could have been no reliance on this alleged communication when Gulf Shores entered into the assignment and license agreements two years earlier.

8. See Standard Oil Company of Louisiana v. Futral, *supra*, 204 La. 215, 15 So.2d 65 (1943); Rodgers v. S. H. Bolinger Co., 149 La. 545, 89 So. 688 (1921).

9. " * * * if Licensee sells its rent-a-car business it may assign the agreement to the purchaser with the consent of the Licensor [Avis] which consent shall not be unreasonably withheld; provided that any assignee hereunder must assume all liabilities and obligations hereunder."

10. It is perhaps worth noting expressly that we do not have here an assignment made after the original franchisee had held the license for more than five years.

11. His signature on each of the three licenses appeared beneath Gulf Shores' name, and indicated his position as president of the corporation.

unconscionable. Since none of these contentions, which could well involve factual inquiries, was presented to the trial judge, this court, acting within its discretion, declines to consider them. Hormel v. Helvering, 312 U.S. 552, 556–557, 61 S.Ct. 719, 85 L.Ed. 1037 (1941); Publicity Building Realty Corp. v. Hannegan, 139 F.2d 583, 587 (C.A.8, 1943); B & G Electric Co. v. G. E. Bass & Co., 252 F.2d 698, 701 (C.A.5, 1958).[12]

Affirmed.

---

12. Appellee filed a motion to strike the portions of appellant's original brief containing these arguments, raised for the first time before this court—which motion was carried with the case. In view of our disposition of those arguments, it is unnecessary to rule on the motion.