52 So.2d 325 (1951)
J. R. WATKINS CO.
v.
STANFORD et al.
J. R. WATKINS CO.
v.
CARMOUCHE et al.
No. 3378-9.
Court of Appeal of Louisiana, First Circuit.
April 30, 1951.
*326 John G. Gibbs, Natchitoches, Seth Lewis, Opelousas, for appellant.
Tate & Fusilier, Ville Platte, Leon S. Haas, Jr., Opelousas, Atlee P. Steckler, Ville Platte, A. V. Pavy, Opelousas, for appellees.
DORE, Judge.
In these consolidated cases, J. R. Watkins Company seeks judgments against the respective principal defendants and their sureties for the alleged balance due on merchandise sold to the respective principal defendants, allegedly per contracts, copies of which were annexed to the petitions.
Defendants filed exceptions, first, of lack of procedural capacity; second, of vagueness; and third, of no right or cause of action.
A trial on the exception of lack of procedural capacity was held, and the trial judge maintained the exception and dismissed the suits. Plaintiff has appealed.
The exception is based on the proposition that plaintiff, a Delaware corporation, is a foreign corporation actually doing business through its agents or employees in the State of Louisiana without having been authorized or licensed to do so, and is therefore barred from prosecuting the suits under the provisions of Act No. 8 of the Third Extra Session of 1935, See Title 12:-211, LSA-Revised Statutes of 1950.
Section 1 of said Act provides: "no foreign corporation doing business in this State shall be permitted to present any judicial demand before any court of this State, unless and until it has complied with the laws of this State for doing business herein, and unless and until it has paid all taxes, excises and licenses due to the State, provided that nothing in this act shall be construed to prevent the bringing of a cause of action against any such foreign corporation."
Section 2 of said Act further provides: "The burden of proof shall rest upon such foreign corporation to establish that it has complied with the laws of this State for doing business herein * * *."
The plaintiff contends that it is not doing business within the State of Louisiana; that therefore the provisions of said Act do not apply to it; and that hence it may sue in the Courts of this State for whatever sums are alleged to be due to it on the contracts involved in these suits. Plaintiff corporation maintains that the relationship between it and the main defendants is that of vendor and vendee of merchandise. It further contends that it has no capital invested in the State; that it has not nor does it maintain in any manner a store, warehouse, or any kind of establishment in the State; that the contracts were signed in Minnesota, and the merchandise purchased by the principal defendants was all shipped from either Tennessee or Minnesota, thus making such shipments interstate commerce.
It is admitted that the plaintiff, a Delaware corporation, is not now authorized to do business in this State.
The question of whether or not plaintiff is doing business within this State is purely a factual one and must be determined from all of plaintiff's activities and transactions, either directly or through socalled "dealers", agents, employees, or supervisors. R. J. Brown Co. v. Grosjean, 189 La. 778, 180 So. 634; Proctor Trust Co. v. Pope, La.App., 12 So.2d 724. It becomes necessary that we give an extended review of what the record discloses and our views and comments on the said record.
The contracts themselves are in the record. Each was a printed form executed between the J. R. Watkins Company and the principal defendant (or "dealer"), and to each contract there were two sureties. There is a studied effort to purport a buyer-seller relationship, whereby the J. R. Watkins Company agrees to sell its merchandise wholesale to the principal defendants, denominated therein as "Purchaser".
*327 The contract is herewith setout in full:
"This Agreement, made at Winona, Minnesota, this _________ day of _____, 19 _____________ between The J. R. Watkins Company, a corporation, hereinafter called "the Company," and _____________________ of ____________________ hereinafter called "the Purchaser," witnesseth,
"1. That in consideration of the promises and agreements of the Purchaser hereinafter contained, to be kept and performed by him, the Company agrees, unless prevented by fire, strikes, or other cause, to sell and deliver to the Purchaser, at its current wholesale prices, free on board cars at Winona, Minnesota, or at its option, at any of its other regular places of shipment, such goods and other articles manufactured or sold by it, as the Purchaser may reasonably require for sale, from the date hereof, until the first day of April, 1948, in the locality in which he is now engaged, or intends to engage, in business, a description of which locality he agrees to furnish and deliver to the Company in writing prior to its acceptance of this agreement; but the furnishing of such description may be waived by the Company at its election, without notice to the Purchaser or the sureties hereon.
"2. And in consideration thereof, the Purchaser agrees to buy from the Company the goods reasonably required by him as aforesaid; and agrees to furnish to it complete, regular, weekly, written records, showing separately the amounts of his cash sales, time sales, and collections; which records, however, or any of them, may be waived by the Company without notice to the sureties hereon, and he also agrees to furnish a complete financial statement when requested to do so.
"3. The Purchaser further agrees to pay the Company its current wholesale prices for the goods and other articles sold to him, as herein provided, and also the prepaid transportation charges thereon, if any, by remitting to the Company each week at least sixty per cent (60%) of the amount received by him from his cash sales, and from his collections on sales previously made, at the time and in the manner and in accordance with the provisions of the weekly record blanks of the Company to be furnished to him; and, at the expiration or termination of this agreement, to pay the whole amount therefor then remaining unpaid; or the Purchaser may pay for such' goods in cash, less the usual cash discount allowed for such payments; but such payments, or any of them, may be waived or extended by the Company without notice to the sureties hereon, and without prejudice to the rights or interests of the Company.
"4. If the Purchaser shall not pay cash for said goods and other articles so sold and delivered to him, and the payments at the time and in the manner hereinbefore provided are insufficient to pay therefor, the Company may, in its discretion, thereafter either limit the sales herein agreed to be made, or from time to time suspend the same, or require cash with each order, or cash upon delivery, until the Purchaser's indebtedness is paid, or reduced, as the Company may require.
"5. The Purchaser may, within thirty days after the expiration or termination of this agreement, return, by prepaid freight, to the Company, at Winona, Minnesota, Memphis, Tennessee, Newark, New Jersey, or Oakland, California, in as good condition as when delivered to him at point of shipment, any goods purchased by him from the Company, which he may then have on hand; and the Company agrees to repurchase such goods, in the units and combinations purchased, if in such condition when received by it, and pay or credit the Purchaser therefor at the invoiced prices or at the Company's then prevailing wholesale prices whichever shall be lower. And, if any goods returned by the Purchaser are not in a salable condition when received by the Company at any of the places above named, the Company will restore them to such condition, if that can reasonably be done, and make a reasonable charge therefor, and deduct such charge from the value of such goods, and pay or credit the Purchaser with the balance. But the Purchaser shall not return, nor the Company pay or allow any credit for, any advertising matter of any kind, or for any goods or articles which have been used, or for any *328 goods which cannot reasonably be restored to a salable condition.
"6. The Purchaser shall have no power or authority to make any statement or representation, or to incur any debt, obligation, or liability of any kind whatsoever, in the name of, or for, or on account of the Company.
"7. The Company shall have no interest in the accounts due for goods sold by the Purchaser; and no oral or written statements, printed, advertising or other matter of the Company, sent to, or distributed by the Purchaser, shall be construed to direct or control the sale or other disposition of said goods, or to change or modify the terms of this agreement.
"8. Masculine terms of expression herein shall be taken to include the feminine where applicable.
"9. It is also mutually agreed that this is the complete, entire and only agreement between the parties, and that it shall not be varied, changed, or modified in any respect except in writing executed by the Purchaser and by an officer of the Company; and that either of the parties hereto may terminate this agreement at any time, if desired, by giving the other party notice thereof in writing by mail.
In Witness Whereof, the Purchaser has hereunto set his hand and seal and the Company has caused these presents to be executed in its corporate name by its proper officer, at Winona, Minnesota."
However, although the contract is drawn in general buyer-seller terminology, it is interesting to note that certain restrictions are imposed upon the so-called "Purchaser" he may buy only goods as "reasonably required" by him and he may sell only "in the locality in which he is now engaged, or intends to engage, in business"; the "Purchaser" shall furnish the Company "complete, regular, weekly, written records, showing separately the amounts of his cash sales, time sales, and collections"; he shall remit each week to the Company "at least sixty per cent (60%) of the amount received by him from his cash sales, and from collections on sales previously made, at the time and in the manner and in accordance with the provisions of the weekly record blanks of the Company as furnished to him."
Four witnesses testified concerning the actual operations of the plaintiff corporation, J. R. Watkins Company, and/or its dealers in Louisiana.
Carl A. Gustafson of Memphis, Tennessee, plaintiff's District Manager of the seven-state Southern district including Louisiana, testified that plaintiff neither owned nor maintained warehouses or capital assets within the State of Louisiana. He testified that articles ordered by the Louisiana dealer were shipped to the dealer directly from Memphis, Tennessee, and that advertising or promotional matter was shipped to the dealer directly from Minnesota.
Under cross-examination, Gustafson admitted that plaintiff maintains at least two salaried "field supervisors" in Louisiana. It may here be noted that although the trial judge noted that Gustafson was an intelligent witness, he was extremely evasive when questioned as to the number of Watkins dealers in Louisiana, the number of salaried supervisors, precise territories, etc. The witness testified that the duties of these field supervisors were to make rounds and to visit the Watkins dealers in their territories, to demonstrate products to them, to take care of complaints, to go out on routes in an advisory capacity with the dealers, and to contact new prospects for dealers. The field supervisors were not supposed to sell anything themselves, although sometimes samples of new products were shipped directly to them for distribution to the Watkins dealers in the supervisors' territory. They were paid salaries of at least two hundred dollars per month.
Gustafson also testified that the J. R. Watkins Company held several sales meetings a year for its Louisiana "dealers". Although he was evasive as to the number of these meetings, he also admitted that they were generally held in the Spring and in the Fall in a circuit including four or five Louisiana cities each time. At these meetings, new products were demonstrated, and samples were given to the dealers, as well as lectures on practical salesmanship. According to Gustafson, attendance on the *329 part of the dealers was voluntary, and the dealers received no compensation for attendance except their meals. These meetings were generally held in a display room in Louisiana hotels, and the sample merchandise to be distributed was most often shipped directly to the hotel from Memphis. The District Manager or another official from Memphis would preside.
Gustafson also testified that it was the Company policy for the dealers to have painted on their vehicles a sign designating them as "Dealer in Watkins Products."
The testimony of Howard Andrus, a Watkins agent or dealer, and of Arthur Kimball and Roland Stanford (the latter a defendant), former Watkins dealers until about six months before the trial, was in the main corroborative of one another.
In summary, the plaintiff vends its products (including a line of patent medicines) through itinerant salesmen or "dealers" who drive from house to house, dispensing Watkins products from their vehicles. The testimony indicates that there are several Watkins dealers to each Parish, each with a definite and specific area within the Parish as his territory; these territories are assigned to the dealers by the plaintiff corporation. A fair deduction can be drawn from the evidence that there must be over one hundred Watkins dealers operating within the State of Louisiana with parts of Louisiana parishes as their specific territories.
These dealers are shipped Watkins' products from plaintiff's Tennessee or Minnesota warehouses, for which the dealers do not pay at time of shipment nor within any set period thereafter. The dealers sell these products to the customers from a price list furnished by plaintiff and at prices set by plaintiff. The dealers must make detailed weekly reports to plaintiff on forms furnished by plaintiff of cash sales, credit sales, and all amounts collected; the dealers must remit weekly sixty per cent of the cash amounts collected (either for cash sales or as payments on past credit sales), retaining forty per cent as their commission. The dealers are permitted and in fact encouraged by plaintiff to sell on credit, but do not pay for the merchandise sold by them on credit sales until their customers pay them or until contract is terminated, at which time payment for the unpaid balance is demanded of the dealer and his sureties. The testimony indicates, incidentally, that these credit sales by dealers to customers are multitudinous but in small amounts, Stanford testifying for instance that the largest amount owing by any of his customers being fourteen dollars with most accounts for much less.
There is some evidence that plaintiff often shipped the dealers to sell, additional and different supplies from those ordered by the dealer.
The evidence indicates that these dealers are required to sell only Watkins products and to devote five days a week to such sales, nor may the dealers sell outside the territories assigned to them by the plaintiff.
In addition to the dealers, operating on a commission basis, plaintiff maintains at least two salaried (and expense-account) employees denominated as "field supervisors." These field supervisors directly supervise the work of the dealers, making rounds and visiting the dealers within their territory, pushing the sales or collections of those lagging; they demonstrate products and salesmanship to the dealers; they are also used to select new personnel as dealers and, probably, to recommend termination of the services of personnel. These field supervisors are also assigned a specific territory; for instance, the field supervisor of the three dealer witnesses was a former dealer named Soileau, who lived in Washington, Louisiana, and had as his territory a specified portion of southern Louisiana excluding New Orleans. These field supervisors did not make sales themselves.
In addition, the Watkins Company sends District Managers and crack sales personnel to Lousiana to hold several meetings a year in the various cities of the State for the dealers in the surrounding area. The evidence conflicted as to whether attendance of dealers was voluntary or compulsory, but two former dealers testified that they were told directly or indirectly that attendance was compulsory. At these meetings, Watkins products were demonstrated, and improved sales methods were sought to *330 be indoctrinated; samples of new Watkins products were there distributed to the dealers. There is also testimony that at the sales meetings, orders from the dealers for new Watkins products were solicited and taken by the Memphis personnel.
While the contracts which were the basis of the relationship between the dealers and the plaintiff were studiously drawn to describe a buyer-seller status, the verbal labels applied by the instrument are not conclusive in determining the actual legal relationship. In determining the rights, obligations, and relationships arising from an instrument, our Courts seek the actual intention and purpose of the parties; and in so doing, all the pertinent facts and circumstances, including the parties' own construction of its meaning and operative effect, are weighed and considered. Paragraph 2 of Art. 1945, Civ.Code.
"When there is anything doubtful in agreements, we must endeavor to ascertain what was the common intention of the parties, rather than to adhere to the literal sense of the terms." Civil Code, Art. 1950.
In W. T. Rawleigh v. Hicks, La.App., 171 So. 616, our brethren of the Second Circuit branded a very similarly worded contract as a "subterfuge", stating that the evidence clearly showed the dealer to be "an agent of plaintiff, assigned to sell its products in a designated territory only, and to sell at prices fixed by it." 171 So. 621. Plaintiff corporation was not permitted to recover therein, and in support of this conclusion three earlier First Circuit cases were cited in which present plaintiff was not permitted to recover against defenses based upon the ground that plaintiff was engaged in doing business in Louisiana, and was not merely seller to its dealers, namely, J. R. Watkins v. Russell, decided in 1924, before decisions of the Courts of Appeal were reported; J. R. Watkins Co. v. Brown, 13 La.App. 244, 126 So. 587; and J. R. Watkins Co. v. Gann, La.App., 159 So. 747. In W. T. Rawleigh Co. v. Coen, La.App., 195 So. 660, plaintiff foreign corporation again was denied recovery on a similar contract, the Court examining the circumstances and determining the relationship was not buyer-seller but principal-agent.
Plaintiff corporation lays great stress upon the Second Circuit case of J. R. Watkins Co. v. Rachal, La.App., 31 So.2d 871, 873, where the plaintiff was permitted to recover. However, in this case the constitutionality of Section 12 of Act No. 56 of 1914, LSA-RS 37:1288 (the statute prohibiting the itinerant vending of patent medicines) was contested. The decision held the act constitutional. The Court held the contract involved was that of vendor and purchaser. But the Court stated: "The present contract [also] does not contain the restrictive provisions present in the former ones, which, among other things, gave to the company the right and power to direct and largely control the activities of the denominated purchaser in selling goods delivered by it to him; nor does the contract, as was true in the older ones, undertake to delineate or define the territory in which he should sell. Here, Rachal had the right to choose the locus of his activities without approval of the company, select his own customers and consummate sales in a manner wholly to his own liking."
"There is no documentary evidence or testimonial proof in the record before us that in the least suggests that the contract involved was modified, changed or altered, or that operations thereunder reflected a relationship of principal and agent rather than that of seller and purchaser as by it declared." (Emphasis ours.) This case is clearly inopposite to our case.
Other cases cited by the plaintiff are dissimilar in facts. They concern legitimate enterprises using actually independent dealers or salesmen dealing with retail outlets. In the present instance, it is to be noted that the so-called "dealers" are the usual retail outlet for plaintiff's products, and these dealers are selected, trained, and encouraged by the plaintiff to sell its products from house to house and door to door. The evidence indicates, and in fact plaintiff's letterhead and witnesses admit, that some of its principal products are patent medicines. We do not believe it to be an unfair conclusion that one of the principal purposes or the alleged buyer-seller contract is to evade regulation by this and other States of the *331 itinerant vending of patent medicines and drugs, prohibited in Louisiana by the terms and interpretations of Section 12, Act No. 56 of 1914. Plaintiff could not of course engage directly in the itinerant vending of medicines and drugs; can it do so any more legitimately by the mere designation of them as "Purchasers"?
Put these questions of public policy aside, we believe the evidence indicates that the plaintiff is a foreign corporation actually doing a substantial business in Louisiana and not authorized to do so, and that therefore it is not entitled to sue in the courts of Louisiana upon matters arising out of its doing business in Louisiana until it has properly qualified with the Secretary of State. Under our view, the ruling of the trial judge on the exception to procedural capacity is correct.
For the above reasons, the judgment of the trial court sustaining the defendants' exception to procedural capacity is affirmed in each case.