**AVIS RENT–A–CAR SYSTEM, INC.**

v.

**GULF SHORES LEASING CORPORATION.**

Civ. A. No. 68–193.

United States District Court,
E. D. Louisiana,
Baton Rouge Division.

Aug. 14, 1970.

Gilbert L. Dozier, Dozier & Thompson, Baton Rouge, La., for plaintiff.

W. P. Wray, Jr., Bert K. Robinson, Wray, Simmons & Robinson, Baton Rouge, La., for defendant.

WEST, Chief Judge:

This case arises out of a dispute between the Plaintiff, Avis Rent-A-Car System, Inc., hereafter referred to as Avis, and the Defendant, Gulf Shores Leasing Corporation, hereafter referred to as Gulf Shores, over the proper interpretation of a series of contracts involving certain car and truck rental franchises servicing the cities of Lafayette, Lake Charles, and Baton Rouge, Louisiana. Avis as Licensor, granted certain franchise rights to Gulf Shores as Licensee, and thereafter sought to terminate the contract, without cause, contending that under the contract, Licensor had the right, within 5 years after issuance of the License, to cancel without having to show cause therefor. Gulf Shores refuses to recognize the termination contending that Avis cannot, under the circumstances here present, terminate without showing cause therefor. By

this suit, Avis seeks (1) a declaratory judgment setting forth the rights and obligations of the respective contracting parties under the terms of the disputed contracts, (2) injunctive relief which would restrain Gulf Shores from operating car and truck rental franchises or outlets as, or under the guise of, an Avis License, or harassing or obstructing Avis in its own operation or, should Avis so choose, its relicensing of such franchises or outlets in the above mentioned cities, (3) the return of all physical indicia now in the possession of Gulf Shores which suggests or denotes any form of association or connection with the Avis Rent-A-Car System, Inc., and (4) damages in the sum of $100,000.00. Pending a final judgment on the merits, on December 19, 1968, this Court issued a preliminary injunction which, in essence, preserved the status quo between the parties and ordered their mutual compliance with the terms of all contracts in question. On June 10, 1969, with the concurrence of both parties, this Court ordered stayed proceedings in a companion suit in which the parties were reversed but which nevertheless raised precisely the same issues which have been presented for decision here. The instant case came on for trial on January 12, 1970, and, after a further allowance of time for the filing of post-trial memoranda, was then taken under advisement based upon documentary exhibits and depositions which were admitted into evidence at the trial and upon a record to which counsel for both sides have jointly stipulated. For reasons which follow, this Court finds for the plaintiff, Avis Rent-A-Car System, Inc. All relief for which Avis has prayed, with the exception of its claim for money damages, will be granted and judgment will be entered accordingly.

Federal subject matter jurisdiction rests on Title 28 USC § 1332. Plaintiff, Avis, is incorporated in Delaware and maintains its principal place of business in New York; defendant, Gulf Shores, is incorporated in Louisiana and maintains its principal place of business in the same state; and, the sum in controversy exceeds, exclusive of interest and costs, the sum of $10,000.00. Thus diversity jurisdiction is found to exist.

The record in this case, the contents of which, as we have said, counsel for both parties have jointly stipulated, shows that on November 1, 1961, Avis prepared and executed a contract, styled by Avis as an "Exclusive License Agreement," with Southwestern Automotive Leasing Corporation, more generally known as SALCO, according to the terms of which SALCO was awarded the exclusive right to operate a car and truck rental franchise of the Avis Rent-A-Car System, Inc. as an Avis Licensee in the city of Lake Charles, Louisiana. Subsequent thereto, on November 15, 1961, Avis and SALCO executed identical exclusive license agreements in which SALCO secured, in addition to the Lake Charles franchise, the Avis Rent-A-Car System, Inc. franchises for the cities of Lafayette and Baton Rouge, Louisiana, and immediately thereafter, pursuant to these agreements, SALCO began operating in all three locations as the Avis Licensee.

SALCO, as an Avis Licensee, apparently achieved only moderate success in the car and truck rental field for the record indicates that Avis finally decided that a different Licensee operating the SALCO franchises might, as the advertisement says, "try harder." It seems evident that Avis must have entertained misgivings about the effectiveness of SALCO as an Avis Licensee because in the early part of 1964, *at the behest of an Avis field representative* named Gene Donaghey, Mr. Roy B. Bowers, now the principal stockholder and general manager of defendant Gulf Shores, contacted one Max W. Hockema, who was then the principal stockholder and general manager of SALCO, with a view toward purchasing from SALCO the Avis licenses which SALCO then held for Lafayette, Lake Charles, and Baton Rouge. Bowers, it seems, had previously been an Avis system Licensee in Wichita Falls, Texas, from August 1, 1963, until July 15, 1964, and, at least at

that time, appears to have been well thought of as a Licensee-Operator by Avis. However, instead of resulting in an outright sale of the Avis licenses, negotiations between Bowers and Hockema eventually led to their joint formation, with the approval of Avis, of a completely new corporation, i. e., defendant Gulf Shores Leasing Corporation, with Bowers and SALCO dividing evenly the ownership of the new corporation's stock.

The record clearly reflects that the express purpose of all of the principal parties involved in the creation of Gulf Shores, Bowers, SALCO, through its principal stockholder Hockema, and Avis, was for Gulf Shores to acquire, as soon as possible, the Avis franchises held by SALCO, and for Bowers to thereafter assume the duties of manager of the new corporation so that the Avis franchises could be more profitably managed. Arrangements to effect the transfer of the Avis licenses from SALCO to Gulf Shores culminated on August 1, 1964, in the execution of three separate agreements by and between SALCO, as assignor, Gulf Shores, as assignee, and Avis, *as approving licensor*, covering each of the three franchises in question, Lafayette, Lake Charles, and Baton Rouge, all of which agreements were entitled, "Agreement of Assignment and Assumption to a Corporation." In return for SALCO's assignment of its Avis licenses, Bowers paid Hockema the sum of $30,000.00, one-half in cash and the remainder, as we have said, in the form of a one-half interest in the outstanding stock of Gulf Shores. The agreements did not require Gulf Shores to pay anything to Avis, either for the licenses themselves or for Avis' approval of the assignments to Gulf Shores. On each of the licenses Avis stamped in large block letters the word, "TRANSFERRED."

The pertinent provisions of each of these "assignments" read:

1. Assignor [SALCO] hereby transfers, assigns and conveys all its right, title and interest in and to said Agreement, the Avis name and the Avis System to Licensee [Gulf Shores] *effective as of August 1, 1964.* Licensee [Gulf Shores] accepts the same, subject to the terms and conditions thereof which Licensee [Gulf Shores] agrees to fully and faithfully perform. Licensee [Gulf Shores] agrees that Licensor [Avis] shall have each and every right with respect to Licensee [Gulf Shores] which Licensor [Avis] would have had against Assignor [SALCO] but for this assignment; * * * (Emphasis added.)

\*    \*    \*    \*    \*    \*

6. The parties hereto agree that the effective date of said Agreement *between Licensor [Avis] and Licensee [Gulf Shores] as assignee shall for all purposes be August 1, 1964.* (Emphasis added.)

The assignment agreements, after having been signed by all parties, were forwarded to Avis' home office in New York, and Gulf Shores began almost immediately to operate the former SALCO franchises as the new Avis Licensee. Some four months later, by means of a letter dated November 20, 1964, Avis, through its Manager of Administrative Services, one W. Leonard Schoultz, advised Bowers that the three assignment agreements had somehow been misplaced within the confines of Avis' home office and that it would therefore be necessary for Bowers and Hockema to sign additional assignment agreements which were to be provided by the same Avis field representative, Gene Donaghey, who had originally brought them together. Donaghey did, in fact, hand-carry new assignment forms to both Bowers and Hockema for their signature. However, at some time subsequent to Bowers' receipt of the aforementioned letter, he also received by mail from Avis three additional sets of contracts, each of which was styled by Avis as an "Exclusive License Agreement," and each of which purported to award Gulf Shores an exclusive right to operate as the Avis Licensee in the very same cities, Lafayette, Lake Charles, and Baton Rouge, in which Gulf Shores was then already operating as the Avis Licensee by virtue

of the misplaced assignments of the former SALCO licenses. As were the original SALCO assignments, the "new" exclusive license agreements mailed by Avis to Bowers were antedated by Avis to August 1, 1964. The record is absolutely clear that Bowers did not read or examine these "new" exclusive license agreements, nor did he inquire of anyone in the Avis organization why they had been forwarded for his signature. Instead, he did as he was asked to do in the accompanying cover letter, and simply signed and returned them to Avis' New York office.

The pertinent identical provisions of both the "new" exclusive licenses, and the licenses acquired by Gulf Shores by way of assignment from SALCO, read:

## 11. WRITTEN CONTRACT ENTIRE AGREEMENT BETWEEN PARTIES

This Agreement supersedes all prior agreements whether written or oral between the parties hereto and contains the entire agreement of the parties and no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein shall be of any force or effect. * * *

\* \* \* \* \* \*

## 13. ASSIGNMENT

This Agreement and all rights hereunder may be assigned or transferred by Licensor, and shall inure to the benefit of the Licensor's successors and assigns. None of the Licensee's interest herein nor the rights hereunder may be transferred, conveyed or assigned, whether by operation of law or otherwise. However, if Licensee sells its rent-a-car business it may assign this agreement to the purchaser *with the consent of Licensor* which consent shall not be unreasonably withheld; provided that any such assignee hereunder must assume all liabilities and obligations hereunder. (Emphasis added.)

## 14. TERMINATION

Either party hereto shall have the right to terminate this Agreement at any time after one year from the date hereof *with or without cause*, except that after January 1, 1958, or *5 years* from the date Licensee first became an Avis System Licensee, whichever is later, Licensor may terminate under this Section 14 *only* with cause; * * * Either party exercising its right to terminate under this Section 14 shall give to the other party hereto, at least 90 days prior to the January 1, or April 1, or July 1, or October 1 preceding or coinciding with such termination date, written notice of its election to do so. * * * (Emphasis added.)

Gulf Shores apparently fared no better as the new Avis Licensee than did its predecessor, SALCO, for on September 30, 1968, Avis advised Gulf Shores principal stockholder and general manager, Roy B. Bowers, that, effective January 1, 1969, Gulf Shores' licenses to operate the Avis franchises in Lafayette, Lake Charles, and Baton Rouge were to be terminated without cause. The authority for effecting such a termination was said by Avis to rest on Article 14 of the "new" exclusive license agreements—those which had been mailed to and signed by Bowers sometime after November 20, 1964, and antedated to August 1, 1964, rather than on the identical language of Article 14 of the former SALCO licenses which had been assigned by SALCO to Gulf Shores. Gulf Shores contends that Avis has no right to so terminate its licenses.

Avis takes the position that pursuant to the provisions of Article 11 thereof, the "new" exclusive license agreements, executed in November of 1964, but by their terms retroactive to August 1, 1964, superseded all prior agreements between the parties, oral and otherwise, including the misplaced assignments of the former SALCO licenses and the assigned SALCO licenses themselves. That being the case, Avis argues, Article 14 of the "new" licenses, as does Article 14 of the SALCO

licenses, provides for termination without cause by Avis at its option at any time after one but not more than five years from the effective date of the licensor-licensee relationship, i. e., August 1, 1964. Therefore, Avis is simply contending that, according to the clear unambiguous language of the pertinent contracts, its termination of Gulf Shores' licenses without cause of September 30, 1968, was timely within the meaning of Article 14, coming as it did, more than one but less than five years from the date Gulf Shores acquired licensee status.

Gulf Shores, on the other hand, takes the position that it acquired the Avis licenses, including the exclusive right to operate the Avis franchises in question, by virtue of *assignment* from *SALCO*, an assignment which, in fact, required and duly received the unqualified approval of Avis, notwithstanding the subsequent executive of "new" exclusive license agreements by and between Avis and Gulf Shores alone. Specifically, Gulf Shores contends that Avis' "five year" right to terminate Gulf Shores' licensee status without cause began running, not on August 1, 1964, the date of SALCO's assignments, and not on the date in November 1964 when Bowers executed the new license agreements, but instead on November 1 and 15, 1961, the date SALCO had initially been awarded the franchises, and that the three-year period that SALCO had operated the franchises as the Avis Licensee inured, by virtue of the assignments, to the benefit of Gulf Shores on August 1, 1964. Under this view, of course, the notice of termination without cause made by Avis to Gulf Shores on September 30, 1968, would have been well beyond the "five year" period mentioned in Article 14 of the assigned SALCO licenses and hence untimely.

■ Alternatively, Gulf Shores argues that Avis treated Roy Bowers personally, rather than Gulf Shores, as the Avis Licensee because (1) Avis required Bowers to own the controlling interest in and to manage Gulf Shores, and (2) Avis

referred to Bowers personally as the Avis Licensee in some ninety-two pieces of correspondence directed to Bowers between August 1964 and September 1968. Then, as has already been pointed out, since Bowers first became an Avis Licensee in Wichita Falls, Texas, in August 1963, Gulf Shores argues that more than five years has elapsed since Bowers, personally, first became an Avis Licensee and, for that reason, concludes that Avis' notice of termination given on September 30, 1968, was untimely. This position is totally devoid of merit. The contracts in question were executed by and between Avis and Gulf Shores— Bowers was not a party thereto. LSA–C.C. Art. 427 (1870). In the further alternative, Gulf Shores has also advanced the proposition that either Avis or one or more of its agents must have perpetrated a fraud on Bowers during the course of the negotiations between Bowers, SALCO, and Avis in mid-1964, because, according to Bowers, nobody from the Avis organization undertook to orally advise him that Avis did not intend for SALCO's three years as an Avis licensee to inure to the benefit of Gulf Shores by way of assignment, at least not for the purpose of determining the outer limit of the five year period within which Avis was at liberty to terminate Gulf Shores' licensee status without cause. We find no evidence of such alleged fraud in this record.

■ After carefully reviewing the voluminous record in this case together with all the documentary exhibits admitted into evidence at the trial on January 12, 1970, this Court is of the opinion that the question for decision is one of timely versus untimely termination of Gulf Shores' Licensee status, since there is absolutely no dispute between the parties that Article 14 of Avis' standard licensing agreement permits Avis to terminate licensee status without cause as long as it does so within the clearly defined time period outlined in the article. The answer to that question, in turn, requires that we identify and fix the exact date on which Gulf Shores first became an

Avis Licensee. Finding that answer in a diversity case such as this requires that this Court adhere to and apply the pertinent law as announced by the Courts of the forum state. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); Wright, Federal Courts, §§ 54–60 (2d Ed. 1970). We note that in this case the parties have stipulated that the law of the forum state, being in fact the state in which the disputed contracts were to be performed, should control. Thus we must look to the law of Louisiana as the governing law in this case. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Williams v. Travelers Ins. Co., 19 So.2d 586 (La.App. 1st Cir. 1944); Comment, Conflict of Laws in Louisiana: Contract, 38 Tul.L.R. 726 (1964). The fundamental principles, therefore, upon which our decision herein is premised are those found in the Louisiana Civil Code under the heading of "Conventional Obligations." The pertinent provisions are:

Art. 1761.

A contract is an agreement, by which one person obligates himself to another, to give, to do or permit, or not to do something, expressed or implied by such agreement.

Art. 1779.

Four requisites are necessary to the validity of a contract:

1. Parties legally capable of contracting.

2. Their consent legally given.

3. A certain object, which forms the matter of the agreement.

4. A lawful purpose.

Art. 1901.

Agreements legally entered into have the effect of laws on those who have formed them.

They cannot be revoked, unless by mutual consent of the parties, or for causes acknowledged by law.

They must be performed with good faith.

Art. 1945.

Legal agreements having the effects of law upon the parties, none but the parties can abrogate or modify them. Upon this principle are established the following rules:

First—That no general or special legislative act can be so construed as to avoid or modify a legal contract previously made;

Second—That courts are bound to give legal effect to all such contracts according to the true intent of all the parties;

Third—That the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences;

Fourth—That it is the common intent of the parties—that is, the intention of all—that is to be sought for; if there was a difference in this intent, there was no common consent and, consequently, no contract.

Art. 1949.

When there is anything doubtful in one contract, it may be explained by referring to other contracts or agreements made on the same subject between the same parties, before or after the agreement in question.

Applying these principles to the agreements here involved, the conclusion is inescapable that a Licensor-Licensee relationship between Avis and Gulf Shores was first created on August 1, 1964, when SALCO assigned, with Avis' approval, those licenses which it in turn had acquired from Avis in November 1961. The assignment agreements are, we believe, explicit that *Gulf Shores'* Licensee status *"for all purposes"* became effective on August 1, 1964, the date of SALCO's assignment, and not on November 1 and 15, 1961, the dates *SALCO* first became an Avis Licensee. Moreover, we are not persuaded that Avis' failure during the course of the negotiations on the transfer of SALCO franchises to orally explain to Bowers that Article 6 of the assignment contracts, and the *"for all purposes"* language con-

tained therein, negated the transfer of SALCO's three years as an Avis Licensee was tantamount to fraud. Nor, we might add parenthetically, does the record contain any other evidence that Avis induced Gulf Shores into a Licensor-Licensee relationship by fraudulent means. In deposition testimony constituting a part of the record presently before us, Mr. W. Leonard Schoultz, who at the time in question was Avis' Manager of Administrative Services and who is now Avis' Vice-President of Licensee-Relations, and Mr. William C. McPike, who at the time in question was Avis' General Counsel, both testified that, in their judgment, it was abundantly clear that Article 6 of the Assignment forms meant that Avis intended for Gulf Shores to become an Avis Licensee for all purposes, on August 1, 1964, and that that date marked the beginning of the five-year period within which Avis could terminate the contract without having to show cause therefor. We agree. It seems extremely doubtful that either party would have expected Avis to give Gulf Shores credit against this five-year probationary period for nearly three years of what Avis considered unsatisfactory by SALCO.

 Whether or not the "Exclusive License Agreements", executed by Avis and Gulf Shores subsequent to August 1, 1964, but antedated to that date, altered their previous Licensor-Licensee relationship resulting from the SALCO assignments is immaterial for, obviously, they too were designed to take effect on August 1, 1964. Thus, under either set of agreements, notice of termination given on September 30, 1968, was timely, and Avis had the right to so terminate without cause if it chose to do so. Avis is entitled to all of the relief which it seeks herein with the exception of its claim for money damages. There is absolutely no evidence in the record that Gulf Shores' failure to acknowledge and comply with Avis' termination notice has resulted in any damage whatsoever to Avis. Under the terms of the preliminary injunction issued by this Court on December 19, 1968, Gulf Shores was obligated to abide by, and has abided by, the terms of its license agreements with Avis. All revenues due Avis have, as far as this record shows, been transmitted by Gulf Shores to Avis. There is no evidence in the record to indicate that another Licensee might have performed in a manner superior to that of Gulf Shores or that another Licensee might have produced additional revenues for Avis. In short, plaintiff has failed to prove, not only by a preponderance of evidence, but by any evidence, that it has suffered any monetary damages by virtue of the refusal of Gulf Shores to accept Avis' termination notice.

For these reasons, judgment will be entered in favor of the plaintiff and against the defendant in accordance herewith and counsel for the plaintiff is instructed to prepare a proposed form of the judgment to be entered.